**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **Eco-Stim Energy Solutions, Inc.,** | § | |
| **EcoStim, Inc.,** | § | **CASE NO. 20-32167** |
| | § | **CASE NO. 20-32169** |
| **Debtors.** | § | |
| | | **(Joint Administration Requested)** |

**DECLARATION OF ALEXANDER NICKOLATOS IN SUPPORT OF CHAPTER 11**
**PETITIONS AND FIRST DAY MOTIONS**

I, Alexander Nickolatos, pursuant to 28 U.S.C. § 1746, do hereby declare, under penalty of perjury, that:

1.      I serve as the Chief Executive Officer of Eco-Stim Energy Solutions, Inc. ("*Eco-Stim*") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors-in-possession (collectively, the "*Debtors*" and together with their non-debtor subsidiaries and affiliates "*Eco-Stim*" or the "*Company*"). Eco-Stim is a publicly held company organized under the laws of Nevada. I have served in my current capacity since 2018.

2.      Prior to becoming the Chief Executive Officer, I served as the Chief Financial Officer and the Assistant Secretary to Eco-Stim. I served in that capacity from July 2014 to October 2018.

3.      As Chief Executive Officer, I am responsible for, among other things, overseeing the operation and financial activities of the Debtors, including, but not limited to, monitoring cash flow, industry trends, liquidity, capital resources, business relationships, workforce issues and financial planning. In this capacity, I have been extensively involved in the events leading up to the commencement of the chapter 11 cases by the Debtors (the "*Chapter 11 Cases*"). I have

detailed knowledge of, and experience with, the business and financial affairs, books and records, and employees of the Debtors and the industry in which they operate.

4.  On April 16, 2020 (the "*Petition Date*"), each of the Debtors filed a voluntary petition seeking relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "*Bankruptcy Code*"). As described below, the Chapter 11 Cases have been commenced to undertake an orderly liquidation of its businesses.

5.  I submit this declaration in support of the chapter 11 petitions ("*Petitions*") and the relief requested by the Debtors in various motions and applications (collectively, the "*First Day Motions*") filed contemporaneously herewith, and to provide an overview of the Debtors and their current circumstances. I have reviewed the Petitions and the First Day Motions and believe that the relief sought therein is essential to ensure that the Debtors' business continues to operate in the ordinary course during the pendency of these Chapter 11 Cases.

6.  Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters addressed in the First Day Motions, or my opinion based upon experience, knowledge and information concerning the Debtors and the industry in which they operate. I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

7.  Section I of this declaration provides an overview of the Chapter 11 Cases. Section II provides background information on the Company's businesses, corporate structure, history and current circumstances, as well as the Chapter 11 Cases. Section III sets forth relevant facts in support of the First Day Motions.

## I.    Overview

8.      Eco-Stim is a Houston-based technology-driven independent oilfield services company that historically offered well stimulation, coiled tubing and field management services to the upstream oil and gas industry.[1] Eco-Stim's service offerings extended to exploration and production companies in the United States and Argentina.

9.      The chart below shows the corporate structure of Eco-Stim:



10.     In September 2018, Eco-Stim completed work under a pressure pumping contract with its primary U.S. customer, with that one U.S. customer accounting for 99% of their total U.S. revenue.  Based on the weakness of the U.S. well stimulation market, in September 2018, Eco-Stim elected to suspend its U.S. well stimulation operations and significantly reduced their

---

[1] Eco-Stim Energy Solutions, Inc. is a public company.  However, on December 28, 2018, the Company received a determination letter from Nasdaq that the Company would be delisted pursuant to the Nasdaq Listing Rules. The Company determined not to appeal the determination and the quotation of the Company's common stock moved to the "Pink Open Market" operated by the OTC Markets Group Inc. The common stock was subsequently delisted from Nasdaq due to the Company's non-compliance with Nasdaq's minimum bid price requirements. Specifically, the Nasdaq suspended trading in the Company's common stock on Nasdaq, effective prior to the regular opening of the market on January 2, 2019. The Nasdaq subsequently filed a Notification of Removal from Listing and/or Registration on Form 25 with the Securities and Exchange Commission, or SEC, on February 26, 2019 to remove the common stock from listing on Nasdaq and withdraw the common stock from registration under Section 12(b) pursuant to Rule 12d2-2(b) of the Exchange Act. Pursuant to Rule 12d2-2(d)(1) of the Exchange Act, the application on Form 25 became effective with respect to the delisting of the common stock ten (10) days after the Form 25 was filed with the SEC.

workforce[2] in alignment with potential near-term opportunities, including pump down and miscellaneous pumping services.

11.     Since that time, Eco-Stim has been actively pursuing the sale of all material equipment, inventory and other operating assets in the United States.  Eco-Stim initially pursued an out-of-court restructuring because it believed, after consulting with its legal and financial advisors, that this path would maximize recoveries to creditors. To this end, during the fourth quarter of 2018, Eco-Stim completed the disposition of certain U.S. equipment and other operating assets to unrelated third parties in several separate transactions in exchange for aggregate of approximately $5.7 million cash proceeds, before commissions and selling expenses. On January 24, 2019, Eco-Stim completed the disposition of certain U.S. equipment to an unrelated third party in exchange for approximately $2.8 million of aggregate cash proceeds, before commissions and selling expenses. On February 21, 2019, Eco-Stim completed the disposition of certain U.S. equipment to an unrelated party in exchange for approximately $6.2 million of aggregate cash proceeds, before commissions and selling expenses. On March 14, 2019, Eco-Stim completed the disposition of certain U.S. equipment to an unrelated party in exchange for approximately $2.1 million of aggregate cash proceeds, before commissions and selling expenses. Net of commissions, Eco-Stim received approximately $16.8 million. In the U.S., Eco-Stim has now sold all the material equipment, inventory and other operating assets relating to its U.S. operations.

12.     In Argentina, Eco-Stim's non-debtor Argentinian subsidiary operated under a transition agreement with its primary customer beginning May 2018 and continued to provide services under that agreement during the third quarter of 2018. Subsequent to the third quarter of

---

[2] As of December 31, 2018, the Debtors had approximately 97 employees, all of which were full-time employees.  As of April 15, 2019, the Debtors had approximately nine employees in Argentina and approximately five employees in the U.S.  As of the Petition Date, Eco-Stim only has two employees assisting with the liquidation, wind-down and now Chapter 11 filings of Eco-Stim and Argentina only has six employees.

2018, Eco-Stim did not provide any services to its primary customer in Argentina under the transition agreement and has not generated any material revenue from our Argentina operations since the third quarter of 2018. Since September of 2018, Eco-Stim has been pursuing strategic alternatives, including alternatives for operations in Argentina that could include selling, reducing the scale of, or shutting down the operations in Argentina.  In line with the decision to either sell the Argentine company or sell the assets of the Argentine company, on March 18, 2019, the Argentinian subsidiary signed an agreement with an unrelated third party to purchase most of the equipment and machinery assets in Argentina. The transactions contemplated by this agreement is expected to close in phases from 2019 through 2021 with only limited operations in Argentina to get to the close of these transactions.[3]

## II.    Events Leading to the Chapter 11 Cases

13.    Eco-Stim operated in a highly cyclical industry, which current events have only exacerbated. The key factor that drove demand for Eco-Stim's services and that drives demand in the oil & gas industry is the level of drilling activity by E&P companies, which in turn depends largely on the current and anticipated economics of new well completions.  E&P companies tend to increase capital expenditures in response to increases in oil and natural gas prices, which generally result in greater revenues and profits for oilfield service companies such as ours.

14.    Based on the lack of demand for Eco-Stim's services in late 2018/early 2019, Eco-Stim undertook aggressive action to downsize their operations at that time and have been undertaking an out-of-court restructuring that has involved the sale of the majority of its assets, as

---

[3] Notably, the Debtors do not anticipate the bankruptcy filings of any of its other affiliates/subsidiaries and none of the foreign affiliates/subsidiaries are currently in any insolvency/bankruptcy proceedings. All of these affiliates/subsidiaries are being (or will eventually be) shut down or sold by the Debtors (or by a liquidating trustee, as appropriate), as will be detailed with more specificity in the disclosure statement to be filed in these cases in the next few business days.

well as the assets of Eco-Stim's wholly owned subsidiaries.  This process was highly successful, as the Debtors were able to pay off their primary secured lender in full and has been able to settle with many of its secured and unsecured creditors at steep discounts.  While Eco-Stim has ultimately settled a large number of claims at steep discounts, the number of pending litigation cases and likely increasing number of soon-to-be-filed litigations against the Debtors has grown significantly.

15.     Given the potentially significant number and amount of these possible claims, the costs associated with mounting a defense on multiple fronts across multiple jurisdictions, and Eco-Stim's current cash/assets compared to the size of the creditor pool, Eco-Stim became increasingly concerned about its ability to manage these litigation costs and/or pay the potential claims in a way that is fair to this entire class of creditors.  This concern, after consulting with its advisors regarding all of its restructuring/liquidation options, led Eco-Stim's management and board to conclude that it should undertake an orderly liquidation of its businesses in a Chapter 11 proceeding in order to continue to maximize value for its creditors.  To this end, Eco-Stim plans on filing a plan of liquidation very quickly in the case—which will establish a liquidating trust to manage and liquidate Eco-Stim's remaining assets and pay creditors their claims consistent with their priorities established by the Bankruptcy Code and pertinent state law.

### III.     First Day Motions

16.     As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' Board of Directors and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below and (b) the immediate and

irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

17.     I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these cases and as described below.

18.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

19.     The relief sought in the First Day Motions is critical to the success of these Chapter 11 Cases. The First Day Motions will maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any adverse effects caused by the chapter 11 filings on the Debtors' businesses and operations. As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. For the reasons set forth below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

20.     ***Motion for Joint Administration of Related Chapter 11 Cases.*** By this Motion, the Debtors seek authorization to jointly administer these Chapter 11 Cases for procedural purposes only. Many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor. Thus, I believe it is appropriate to jointly administer these

cases, thereby reducing fees and costs, avoiding needless duplicative filings and enabling a more efficient and economical administration of the Chapter 11 Cases. Furthermore, I understand that creditors' rights will not be adversely affected as this motion seeks only administrative, not substantive, consolidation of the estates.

21.      ***Motion to Approve Continued Use of Cash Management System.*** By this motion, the "*Cash Management Motion*"), the Debtors seek entry of an interim and final order: (i) authorizing the continued use of the existing cash management system, bank accounts, and business forms; (ii) authorizing the continued use of intercompany arrangements; and (iii) granting waiver of investment and deposit requirements under Section 345 of the Bankruptcy Code.

22.      To lessen the impact of the chapter 11 filings on the Debtors' business, I believe it is vital that the Debtors keep their cash management system in place and be authorized to pay outstanding fees owed in relation to the Debtors' bank accounts, such as payments to third-party vendors whose services are critical for the uninterrupted operation of the business/wind-down. Any disruption to that system would severely impair the operations of the Debtors and ability of parties to optimize business performance to the detriment of all parties in interest.

23.      ***Motion for Authority to Pay Prepetition Wages and Continue Benefits***. By this motion, (the "*Wages Motion*"), the Debtors seek entry of an interim and final order: (i) authorizing the Debtors to pay pre-petition employee salaries, reimbursable employee expenses, employee benefits and other compensation, and (ii) directing all banks to honor certain related pre-petition transfers.

24.      As described in detail in the Wages Motion, the Debtors' workforce generally relies exclusively on the compensation and benefits provided by or funded by the Debtors to continue paying their daily living expenses, and will be exposed to significant financial difficulties if

Debtors are not permitted to pay these obligations. I believe that if they are unable to honor such obligations immediately, morale and loyalty will be jeopardized at a time when the support of these individuals is critical.

25.     If the Debtors fail to pay the Pre-petition Employee Obligations, as defined in the Wage Motion, in the ordinary course, such a result would have a highly negative impact on the morale of employees and likely would result in turnover, thereby resulting in immediate and irreparable harm to the Debtors and each estate. Honoring the Pre-Petition Employee Obligations will minimize the level of disruption and preserve the loyalty of Debtors' employees so necessary for any successful path forward in the Chapter 11 Cases. Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

26.     I strongly believe it is critical that the Debtors be permitted to pay prepetition wages and continue with their ordinary course personnel policies, programs and procedures, including, but not limited to, maintenance of workers' compensation programs, healthcare programs, and PTO obligations that were in effect prior to the Petition Date.

27.     ***Motion for Authority to Continue Insurance and Pay Prepetition Claims***. By this motion (the "*Insurance Motion*"), the Debtors seek authority to continue pre-petition insurance programs and to pay any pre-petition premiums and related obligations. Maintaining the existing insurance programs is necessary to preserve the value of the estates and the Debtors' business. Any lapse or disruption in insurance coverage could result in immediate and severe consequences for the business. Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to operate in key jurisdictions.

28.     Further, the Debtors believe they may need to make upcoming payments to the Carriers and the Broker, as defined in the Insurance Motion. If the Debtors are unable to continue

their ordinary business operations by continuing to pay the Carriers and the Broker as they become due, and to reassure the Carriers and the Broker that authority has been granted to honor all such claims, the Debtors may suffer immediate and irreparable harm

29. ***Motion to Authorize Filing of a Consolidated List of Creditors, Approving the Form and Manner of Notifying Creditors of the Commencement of The Chapter 11 Cases and Other Information; and Modifying the Manner of Notifying Equity Security Holders***. By this motion, the Debtors seek entry of an order authorizing them to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and the scheduling of the meeting of creditors under section 341 of title 11 of the Bankruptcy Code, and modifying the requirement to provide notice directly to the Debtors' equity security holders.

30. Given the interrelated nature of the Debtors' business operations, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming and administratively burdensome; as such, utilizing a consolidated list of key creditors will help alleviate these burdens and costs, while reducing the possibility of duplicative service. Accordingly, the Debtors believe that filing a consolidated list of creditors and serving single notice of commencement will maximize efficiency and assist in an orderly transition into chapter 11.

## Conclusion

31. In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request

that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Alexander Nickolatos
Chief Executive Officer