**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **Eco-Stim Energy Solutions, Inc.,** | § | |
| **Eco-Stim, Inc.,** | § | **CASE NO. 20-32167** |
| | § | **CASE NO. 20-32169** |
| **Debtors.** | § | |
| | | **(Jointly Administered)** |

**DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION OF DEBTORS ECO-STIM ENERGY SOLUTIONS, INC. AND ECOSTIM, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Dated: April 23, 2020)**

This Disclosure Statement is subject to final approval by the United States Bankruptcy Court for the Southern District of Texas and other customary conditions. Acceptances or rejections of the *Plan of Liquidation of Debtors Eco-Stim Energy Solutions, Inc. and EcoStim, Inc. Under Chapter 11 of the Bankruptcy Code* will be solicited upon provisional approval of this Disclosure Statement by the Bankruptcy Court. Such solicitation will only be made in compliance with applicable provisions of the Bankruptcy Code. A hearing on final approval of the Disclosure Statement and confirmation of the Plan will take place on [____] at [____] (CST). Future developments relating to the matters described herein may require modification, additions, or deletions to this Disclosure Statement. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

# Table of Contents

**INTRODUCTION** ........................................................................................................ 5

**ARTICLE I - HISTORICAL BACKGROUND AND PREPETITION BUSINESS OPERATIONS** . 8

**ARTICLE II - FACTORS LEADING TO FILING OF THE CHAPTER 11 CASES / CASE STATUS** ................................................................................................ 10

**ARTICLE III - PURPOSE OF CHAPTER 11** ...................................................... 10

**ARTICLE IV - ASSETS OF THE DEBTOR** .......................................................... 11

    4.1    Eco-Stim Energy Solutions, Inc. ........................................................... 11

    4.2    EcoStim, Inc. ........................................................................................ 12

    4.3    Claims and Causes of Action (Both Debtors) ..................................... 12

**ARTICLE V - LIABILITIES OF THE DEBTORS** ................................................ 13

    5.1    Administrative Claims .......................................................................... 13

    5.2    Priority Claims ..................................................................................... 14

    5.3    Creditors Holding Secured Claims ...................................................... 14

    5.4    General Unsecured Claims .................................................................... 14

    5.5    Pending Litigation Involving the Debtor .............................................. 14

**ARTICLE VI - MATTERS ARISING DURING THE CHAPTER 11 CASES** ....... 16

    6.1    Commencement of the Debtors' Cases ................................................. 16

    6.2    Events Occurring After Commencement of the Debtors' Cases .......... 16

**ARTICLE VII - THE PLAN OF REORGANIZATION** ........................................ 17

    7.1    Summary of the Plan ............................................................................. 17

    7.2    The Litigation Trust ............................................................................. 18

    7.3    Acceptance and Confirmation of the Plan ........................................... 23

**ARTICLE VIII - LIQUIDATION ANALYSIS** ..................................................... 25

**ARTICLE IX - VOTING PROCEDURES** .............................................................. 26

    9.1    Classes Entitled to Vote on the Plan .................................................... 26

    9.2    Persons Entitled to Vote on the Plan .................................................... 27

    9.3    Votes Required For Class Acceptance .................................................. 27

    9.4    Voting Instructions ............................................................................... 27

    9.5    Contested and Unliquidated Claims ..................................................... 29

    9.6    Possible Reclassification of Creditors and Interest Holders ............... 29

**ARTICLE X - MODIFICATION OF THE PLAN** ................................................. 29

    10.1    Modification or Revocation of the Plan; Severability .......................... 29

**ARTICLE XI - RISK FACTORS** .......................................................................... 30

    11.1    Uncertain Results From Collection of Eco Argentina Receivables ..... 30

11.2   Uncertain Results From Sale of Eco Argentina Interests............................................................30

11.3   Uncertainty of Litigation Settlements……………………………………………………..30

11.4   Insufficient Acceptances ...........................................................................................................30

**ARTICLE XII - CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.........31

12.1   Tax Consequences to the Debtors ............................................................................................31

12.2   Tax Consequences to Creditors................................................................................................32

**ARTICLE XIII - RECOMMENDATION OF THE DEBTORS** ........................................................34

## **TABLE OF EXHIBITS**

**Exhibit A:**     Plan of Reorganization

**Exhibit B:**     Liquidation Analysis

## INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") and the accompanying ballot (the "**Ballot**") are being furnished by chapter 11 debtors Eco-Stim Energy Solutions, Inc. ("Solutions") and EcoStim, Inc. ("Eco Inc.," and collectively with Solutions, the "**Debtors**") to the holders of Claims against the Debtor pursuant to Section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") in connection with the solicitation of ballots for the acceptance of the *Plan of Liquidation of Debtors Eco-Stim Energy Solutions, Inc. and EcoStim, Inc. Under Chapter 11 of the Bankruptcy Code* (the "**Plan**," a copy of which has been attached hereto as **Exhibit A**).

Capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings as defined in the Plan or, if not defined in the Plan, as defined in the Bankruptcy Code.

On April 16, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Texas, Houston Division (the "**Bankruptcy Court**"). No Official Committee of Unsecured Creditors has been appointed by the United States Trustee in this case.

On [_____], after notice and a hearing, the Bankruptcy Court entered an order (the "Prior Disclosure Statement Order") [Docket No. ___] conditionally approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtors' creditors and equity holders to make an informed judgment regarding the Plan. Pursuant to the Prior Disclosure Statement Order, this Disclosure Statement was deemed approved, but only for purposes of solicitation of the Plan and related Disclosure Statement, provided no objections are received by the relevant deadline. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Prior Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan. Detailed instructions for voting to accept or reject the Plan accompany each ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the *Notice of Supplement to the Debtors' Plan of Liquidation* [Docket No. ___] (the "**Plan Supplement**"), the exhibits attached to all of the foregoing documents, the agreements and documents described therein, the Prior Disclosure Statement Order, and the instructions accompanying the ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

No statement or information concerning the Debtors (especially with respect to distributions to be made under the Plan) or any of the Debtors' assets, properties or business that is given for the purpose of soliciting acceptances or rejections of the Plan, is authorized other than as

set forth in this Disclosure Statement.  In the event of any inconsistencies between the provisions of the Plan and this Disclosure Statement, the provisions of the Plan shall control.

This Disclosure Statement contains only a summary of the Plan and certain other documents.  It is not intended to replace a careful and detailed review and analysis of the Plan and other documents, but only to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan and the exhibits, agreements, and documents contained within the Plan Supplement.  If there is a conflict between the Plan or the Plan Supplement and this Disclosure Statement, the provisions of the Plan or Plan Supplement, as applicable, will govern. You are encouraged to review the full text of the Plan and the Plan Supplement and to read carefully the entire Disclosure Statement, including all exhibits hereto, before deciding how to vote with respect to the Plan.  The Debtors do not warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

After carefully reviewing this Disclosure Statement and all exhibits and schedules attached hereto, please indicate your acceptance or rejection of the Plan by voting to accept or reject the Plan on the enclosed Ballot.

**BALLOTS SHOULD BE MARKED, SIGNED, DATED AND RETURNED SO THAT THEY ARE *ACTUALLY RECEIVED* BY NO LATER THAN 5:00 P.M., (CST) ON [\_\_\_\_] AT 5:00 P.M. (CST) (THE "<u>VOTING DEADLINE</u>") AT THE FOLLOWING ADDRESS, AS SET FORTH ON THE ENCLOSED RETURN ENVELOPE:**

**KILMER CROSBY & QUADROS PLLC**
**c/o BRIAN KILMER**
**712 Main Street, Suite 1100**
**Houston, Texas 77002**
**Telephone:  713-300-9662**
**Facsimile:  214-731-3117**

**BALLOTS MAY BE SENT BY FACSIMILE OR E-MAIL PROVIDED THEY ARE <u>RECEIVED</u> BY THE ABOVE DEADLINE AND AN ORIGINAL FOLLOWS PROMPTLY BY MAIL OR OTHER DELIVERY METHOD.  ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED (UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT).  BALLOTS THAT ARE RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE USED IN CONNECTION WITH THE DEBTOR'S REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF, EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT.**

**THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL CLAIMANTS OF THE DEBTORS AND, CONSEQUENTLY, THE DEBTORS URGE ALL CLAIMANTS TO VOTE TO ACCEPT THE PLAN.**

This Disclosure Statement has been compiled by the Debtors to accompany the Plan. The factual statements, financial information, and other information contained in this Disclosure Statement have been taken from documents prepared by the Debtors, including the Debtors'

Schedules and Statements of Financial Affairs, pleadings filed in the Bankruptcy Case, and information obtained in the Bankruptcy Case. Nothing contained in this Disclosure Statement shall have any preclusive effect against the Debtors (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding which may exist or occur in the future. This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Debtors with regard to any of the statements made herein, and all rights and remedies of the Debtors are expressly reserved in this regard. This Disclosure Statement contains statements which constitute the Debtors' or other third parties' views of certain facts. All such disclosures should be read as assertions of such parties. To the extent any paragraph does not contain an express reference that it constitutes an assertion of a particular party, it should be read as an assertion of the party indicated by the context and meaning of such paragraph.

The statements contained in this Disclosure Statement are made either as of the Petition Date or the date hereof unless another time is specified herein, and neither delivery of this Disclosure Statement nor any exercise of rights granted in connection with the Plan shall, under any circumstances, create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement.

Some of the information contained in this Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be inaccurate, and contains projections which may prove to be wrong, or which may be materially different from actual future results. Each Claimant should independently verify and consult its individual attorney and accountant as to the effect of the Plan on such individual Claimant or Interest holder.

The Debtor strongly urges each recipient entitled to vote on the Plan to review carefully the contents of this Disclosure Statement, the Plan, the Plan Supplement, and the other documents that accompany or are referenced in this Disclosure Statement in their entirety before making a decision to accept or reject the Plan.

**IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND RETURNING IT TO COUNSEL FOR THE DEBTORS, AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS THAT ACCOMPANY THE BALLOT. SHOULD YOU HAVE ANY QUESTIONS REGARDING THE VOTING PROCEDURES, YOUR BALLOT, OR THE BALLOT INSTRUCTIONS, OR IF YOUR BALLOT IS DAMAGED OR LOST, CONTACT COUNSEL FOR THE DEBTORS AT THE FOLLOWING ADDRESS:**

**KILMER CROSBY & QUADROS PLLC**
**712 Main Street, Suite 1100**
**Houston, Texas 77002**
**Telephone:  713-300-9662**
**Facsimile:  214-731-3117**

The Prior Disclosure Order fixes [_____] at [_____], in the Courtroom of the Honorable David R. Jones, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas, 77002, Courtroom 400, as the date, time, and place for the hearing on Confirmation of the Plan and final approval of the Disclosure Statement, and fixes [_____] as the date by which all objections to final approval of the Disclosure Statement and Confirmation of the Plan must be filed with the Bankruptcy Court and received by counsel for the Debtors.  The Debtors will request Confirmation of the Plan at the Confirmation Hearing.

# ARTICLE I
## HISTORICAL BACKGROUND AND PREPETITION BUSINESS OPERATIONS

The Debtors are a Houston-based technology-driven independent oilfield services company that has historically offered well stimulation, coiled tubing and field management services to the upstream oil and gas industry.[1]  The Debtors' service offerings extended to exploration and production companies in the United States and Argentina.  Eco-Stim Energy Solutions Argentina, SA ("**Eco Argentina**"), a wholly-owned non-Debtor subsidiary of the Debtors, is the operational entity for the Debtors' business in Argentina.

The chart below shows the corporate structure of the Debtors:



Eco-Stim Energy Solutions, Inc.
Company Chart
March 31, 2020

---

[1] Solutions is a public company.  However, on December 28, 2018, Solutions received a determination letter from Nasdaq that Solutions would be delisted pursuant to the Nasdaq Listing Rules. The Debtors determined not to appeal the determination, and the quotation of Solution's common stock moved to the "Pink Open Market" operated by the OTC Markets Group Inc. The common stock was subsequently delisted from Nasdaq due to Solutions' non-compliance with Nasdaq's minimum bid price requirements. Specifically, the Nasdaq suspended trading in Solutions' common stock on Nasdaq, effective prior to the regular opening of the market on January 2, 2019.  The Nasdaq subsequently filed a Notification of Removal from Listing and/or Registration on Form 25 with the Securities and Exchange Commission, or SEC, on February 26, 2019 to remove the common stock from listing on Nasdaq and withdraw the common stock from registration under Section 12(b) pursuant to Rule 12d2-2(b) of the Exchange Act. Pursuant to Rule 12d2-2(d)(1) of the Exchange Act, the application on Form 25 became effective with respect to the delisting of the common stock ten (10) days after the Form 25 was filed with the SEC.

In September 2018, the Debtors completed work under a pressure pumping contract with their primary U.S. customer, with that one U.S. customer accounting for 99% of their total U.S. revenue.  Based on the weakness of the U.S. well stimulation market, in September 2018, the Debtors elected to suspend their U.S. well stimulation operations and significantly reduced their workforce[2] in alignment with potential near-term opportunities, including pump down and miscellaneous pumping services.

Since that time, the Debtors have been actively pursuing the sale of all material equipment, inventory and other operating assets in the United States.  The Debtors initially pursued an out-of-court restructuring because they believed, after consulting with their legal and financial advisors, that this path would maximize recoveries to creditors.  To this end, during the fourth quarter of 2018, the Debtors completed the disposition of certain U.S. equipment and other operating assets to unrelated third parties in several separate transactions in exchange for aggregate of approximately $5.7 million cash proceeds, before commissions and selling expenses.  On January 24, 2019, the Debtors completed the disposition of certain U.S. equipment to an unrelated third party in exchange for approximately $2.8 million of aggregate cash proceeds, before commissions and selling expenses.  On February 21, 2019, the Debtors completed the disposition of certain U.S. equipment to an unrelated party in exchange for approximately $6.2 million of aggregate cash proceeds, before commissions and selling expenses.  On March 14, 2019, the Debtors completed the disposition of certain U.S. equipment to an unrelated party in exchange for approximately $2.1 million of aggregate cash proceeds, before commissions and selling expenses (the four sales described immediately above, the "**Prepetition Sales**").  Net of commissions, the Debtors realized approximately $16.8 million in the aggregate from the Prepetition Sales.  In the U.S., the Debtors have now sold all material equipment, inventory and other operating assets relating to their U.S. operations.

In Argentina, Eco Argentina operated under a transition agreement with its primary customer beginning May 2018 and continued to provide services under that agreement during the third quarter of 2018.  Subsequent to the third quarter of 2018, the Debtors have not provided any services to their primary customer in Argentina under the transition agreement and have not generated any material revenue from Eco Argentina's operations since the third quarter of 2018.  Since September 2018, the Debtors have been pursuing strategic alternatives, including alternatives for operations in Argentina that could include selling, reducing the scale of, or shutting down operations in Argentina.  In line with the decision to either sell Eco Argentina or sell the assets of Eco Argentina, on March 18, 2019, Eco Argentina signed an agreement with an unrelated third party to purchase most of the equipment and machinery assets in Argentina. The transactions contemplated by this agreement were expected to close in phases during 2020 and 2021 with only limited operations in Argentina to get to the close of these transactions.[3]

---

[2] As of December 31, 2018, the Debtors had approximately 97 employees, all of which were full-time employees.  As of April 15, 2019, the Debtors had approximately nine employees in Argentina and approximately five employees in the U.S.  As of the Petition Date, the Debtors have only two employees and a couple of third-party contractors assisting with the liquidation, wind-down and now Chapter 11 filings of the Debtors.  Eco Argentina only has six employees.  Importantly, to ensure continuity of operations in and facilitation of the liquidation of non-Debtor Eco Argentina during the pendency of these bankruptcies, Eco Argentina has elected to continue to employ Carlos Fernandez ("**Fernandez**"), the General Manager and Chairman of the Board of Eco Argentina.

[3] Notably, the Debtors do not anticipate the bankruptcy filings of any of their other affiliates/subsidiaries, and none of the foreign affiliates/subsidiaries are currently in any insolvency/bankruptcy proceedings. All of these

## ARTICLE II
## FACTORS LEADING TO FILING OF THE CHAPTER 11 CASES / CASE STATUS

The Debtors operate in a highly cyclical industry, which current events have only exacerbated. The key factor that drove demand for the Debtors' services and overall demand in the oil & gas industry is the level of drilling activity by E&P companies, which in turn depends largely on the current and anticipated economics of new well completions. E&P companies tend to increase capital expenditures in response to increases in oil and natural gas prices, which generally result in greater revenues and profits for oilfield service companies like those of the Debtors.

Based on the lack of demand for the Debtors' services in late 2018/early 2019, the Debtors undertook aggressive action to downsize their operations at that time and have been undertaking an out-of-court restructuring that has involved the sale of many of their assets, as well as the assets of the Debtors' wholly owned subsidiaries. This process was highly successful, as the Debtors were able to pay off their primary secured lender in full and have been able to settle with many of their unsecured creditors at steep discounts. While the Debtors have ultimately settled a large number of claims at a significant discount, the volume of pending litigation against the Debtors and the likely increasing volume of prospective litigation against the Debtors has grown significantly.

Given the potentially significant number and amount of these possible claims, the costs associated with mounting a defense on multiple fronts across multiple jurisdictions, and the Debtors' current cash/assets compared to the overall size of the creditor pool, the Debtors became increasingly concerned about their ability to manage litigation costs and/or pay the potential claims in a way that is fair to their creditor base. This concern, after consulting with their advisors regarding all of their restructuring/liquidation options, led the Debtors' management to conclude that they should undertake an orderly liquidation of their businesses in a chapter 11 proceeding in order to continue to maximize value for their creditors. To this end, the Debtors have filed a plan of liquidation very quickly in the case – which will establish a liquidating trust to manage and liquidate the Debtors' remaining assets and pay creditors their claims consistent with their priorities established by the Bankruptcy Code and pertinent state law.

## ARTICLE III
## PURPOSE OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The Plan described within this Disclosure Statement is a liquidating plan. Unlike a traditional plan of reorganization, which contemplates a restructuring of a debtor's obligations and the emergence of the debtor as a going concern, a plan of liquidation provides for the orderly wind-down and liquidation of substantially all of a debtor's assets and subsequent distribution of the proceeds of

---

affiliates/subsidiaries are being (or will eventually be) shut down by the Debtors (or by a liquidating trustee, as appropriate).

the liquidation to the debtor's various creditor constituencies in accordance with the priorities established under the Bankruptcy Code.

The commencement of a Chapter 11 case creates an "estate" comprised of all the legal and equitable interests of a debtor. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may remain in possession of its property and continue to operate its business as a "debtor-in-possession." Thus, since the Petition Date, the Debtors have been operating and managing their business operations in the ordinary course of business and under the supervision of the Bankruptcy Court.

Confirmation of the plan of liquidation described in this Disclosure Statement and embodied in the Plan is the principal purpose of these Chapter 11 cases. The plan is the vehicle for satisfying the holders of claims against and equity interests in a debtor. Under the Bankruptcy Code, when soliciting acceptance or rejection of a plan of liquidation, a debtor must transmit to the holders of claims or interests a disclosure statement approved by the court as containing "adequate information." On [_____], after notice and a hearing, the Bankruptcy Court entered the Prior Disclosure Statement Order, which conditionally approved this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtors' creditors and equity holders to make an informed judgment regarding the Plan. Pursuant to the Prior Disclosure Statement Order, this Disclosure Statement was deemed approved, but only for purposes of solicitation of the Plan and related Disclosure Statement, provided no objections are received by the relevant deadline. This Disclosure Statement describes various transactions contemplated under the Plan and is supplied to you for purposes of assisting in your evaluation of, and your decision of how to vote on, the Plan.

## ARTICLE IV
## ASSETS OF THE DEBTORS

The following is a summary description of each of the Debtors' principal assets as they existed as of the date the Debtors filed their schedules of assets and liabilities (the "**Schedules**"). The information has been compiled from each of the Debtors' records and the Schedules.

### 4.1    Eco-Stim Energy Solutions, Inc.

**Cash/Cash Equivalents**: The Schedules filed by Solutions indicate that Solutions had cash on hand a money marketing account totaling $10,243.76 as of the time of the filing of the Schedules.

**Deposits**: The Schedules filed by Solutions indicate that Solutions had legal retainers totaling $22,722.50 as of the time of the filing of the Schedules.

**Accounts Receivable**: The Schedules filed by Solutions indicate that Solutions had viable collectible accounts and intercompany receivables in the approximate amount of $599,247.29 as of the time of the filing of the Schedules. Of this amount, $99,247.29 in accounts receivable was aged less than 90 days.

**Investments.**  The Schedules filed by Solutions indicate that, as of the time of the filing of Solutions' Schedules, Solutions had non-publicly traded equity interests in Eco Inc. (100%), Eco Argentina (76.91%), and wholly-owned non-Debtor subsidiaries Cherokee Rock, LLC (100%) and Viking Rock Holding, AS (100%).  The value of these equity interests is currently unknown.
.

**Office Furniture**: The Schedules filed by Solutions indicate that Solutions had owned office equipment with a total value of $3,880 at the time of the filing of the Schedules.

### 4.2   EcoStim, Inc.

**Cash/Cash Equivalents**: The Schedules filed by Eco Inc. indicate that Eco Inc. had cash in a checking account totaling approximately $1,930,900.35 as of the time of the filing of the Schedules.

**Deposits**: The Schedules filed by Solutions indicate that Solutions had legal retainers totaling $126,732.50 as of the time of the filing of the Schedules.

**Investments.**  The Schedules filed by Eco Inc. indicate that, as of the time of the filing of EcoStim's Schedules, EcoStim had non-publicly traded equity interests in Eco Argentina (23.09%).  The value of these equity interests is currently unknown.

### 4.3   Claims and Causes of Action (Both Debtors)

**Claims and Causes of Action:** The Debtors own the following claims and causes of action:

(a)   **Preferential Transfers/Fraudulent Transfers**. Within 90 days of the Petition Date, the Debtors each made a number of payments to creditors (each transfer, a "**90-Day Transfer**").  Each 90-Day Transfer is potentially an avoidable preference or fraudulent transfer A list of the 90-Day Transfers made by each Debtor is contained in the respective Debtor's Statement of Financial Affairs (each, a "**SOFA**") filed by each Debtor in response to question 3 therein. These transfers total approximately $1,061,719.17 between both Debtors.  The Debtors have not attempted to estimate the potential recoveries on the 90-Day Transfers.

In addition, each of the Debtors may have made other payments or transfers more than ninety days, but less than 1 year, before the Petition Date that may be avoidable and are listed in response to question 4 of the SOFA (each transfer, a "**1-Year Transfer**," and collectively with the 90-Day Avoidance Actions, the "**Prepetition Transfers**").  These transfers total $1,224,528.54 between both Debtors.  The Debtors have not attempted to estimate the potential recoveries on the 1-Year Transfers.

Section 546 of the Bankruptcy Code provides a time frame of two years from the entry of Order for Relief (the date of entry of the Order for Relief is the same as the Petition Date) within which to bring an action to set aside an avoidable preference or fraudulent transfer.

(b)   **General Causes of Action.**  At the present time, the Debtors do not believe that they possess any claims or causes of action against third-parties. However, to the extent it is determined that the Debtors possess any existing causes of action, the Debtors specifically retain any

such causes of action, including any and all claims, rights and causes of action that have been or could have been brought by or on behalf of the Debtors arising before, on or after the Petition Date, known or unknown, in contract or in tort, at law or in equity or under any theory of law, including, but not limited to any and all claims, rights and causes of the Debtors or their Estates may have against any Person arising under chapter 5 of the Bankruptcy Code, or any similar provision of state law or any other law, rule, regulation, decree, order, statute or otherwise including avoidance actions as stated above, any and all claims, causes of action, counterclaims, demands, controversies, against third parties on account of costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, and executions of any nature, type, or description which the Debtors have or may come to have, including, but not limited to, negligence, gross negligence, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies (both civil and criminal), racketeering activities, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of fiduciary duty, breach of any alleged special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, whether or not in connection with or related to this Plan, at law or in equity, in contract in tort, or otherwise, known or unknown, suspected or unsuspected.

## ARTICLE V
## LIABILITIES OF THE DEBTORS

**5.1** **Administrative Claims**: Administrative Claims are any Claims defined in section 503(b) of the Bankruptcy Code as "administrative expenses" and granted priority under section 507(a)(1) of the Bankruptcy Code, including:

> (1) a Claim for any cost or expense of administration in connection with these cases, including, without limitation, any actual, necessary cost or expense of preserving the Debtors' Estates and of operating the businesses of the Debtors incurred on or before the effective date of the Plan (the "**Effective Date**");

> (2) the full amount of all Claims for compensation for legal, accounting and other services or reimbursement of costs under sections 330, 331 or 503 of the Bankruptcy Code;

> (3) all fees and charges assessed against the Debtor's Estate under Chapter 123 of Title 28 of the United States Code; and

> (4) a Claim for post-petition Taxes and related items, including any interest and penalties on such post-petition Taxes.

>> (a) **Professionals**. The Debtors intend to retain the law firm of Kilmer Crosby & Quadros PLLC ("**KCQ**," and KCQ collectively with any other professionals the Debtor may retain, the "**Professionals**") as their

bankruptcy counsel.  Under the Plan, the Professionals will be required to file with the Bankruptcy Court a final fee application by the Professional Fee Claim Bar Date as set forth in the Plan.

    (b)   **Other Asserted Administrative Claims.** No other requests for administrative expense payments have been filed in this case. All requests for administrative expense reimbursement other than fees of Professionals must be filed by the Administrative Claims Bar Date as set forth in the Plan.

**5.2**    **Priority Claims.** Priority Claims are unsecured Claims which are entitled to priority above General Unsecured Claims under section 507(a)(1) of the Bankruptcy Code. The Debtors do not believe they owe any amounts on account of Priority Claims.

**5.3**    **Creditors Holding Secured Claims.** Neither of the Debtors' Schedules reflect any secured claims.

    (a)   **Taxing Authorities.** Certain state or relevant municipalities and government entities are entitled to automatic first lien priority pursuant to their state laws or are entitled to secured status by virtue of the collateral that is located in such state. Although the Debtors do not believe that any taxes currently exist which would entitle any taxing authorities to a lien, to the extent such taxes exist, the Debtors intend to make Bankruptcy Court-approved payments as to such taxes.

**5.4**    **General Unsecured Claims.**

    (a)   **Solutions.** Solutions has filed Schedules which list Creditors holding general unsecured claims (the "**Solutions General Unsecured Claims**") in the aggregate amount of $10,466,827.30. Of this amount, $451,689.24 is listed as contingent, disputed, and unliquidated, leaving an approximate total of $10,015,138.10 in Solutions General Unsecured Claims which are not listed as contingent, disputed, and liquidated.

    (b)   **Eco Inc.** Eco Inc. has filed Schedules which list Creditors holding general unsecured claims (the "**Eco Inc. General Unsecured Claims**," and collectively with the Solutions General Unsecured Claims, the "**General Unsecured Claims**") in the aggregate amount of $775,026.70. Of this amount, $0.00 is listed as contingent, disputed, and unliquidated (the "**Eco Inc. CDU Claims**," and collectively with the Solutions CDU Claims, the "**CDU Claims**"), leaving an approximate total of $775,026.70 in Eco Inc. General Unsecured Claims which are not listed as contingent, disputed, and liquidated.

**5.5**    **Pending Litigation Involving the Debtors.** The Debtors are defendants to various certain litigation brought by various counterparties of the Debtors, as well as tax audits implemented by state taxing agencies. All prepetition litigation and proceedings have been stayed by the Debtors' bankruptcy filings. The pending litigation can be summarized as follows:

**Eco Inc.**

| ***Litigation*** | ***Nature of Dispute*** |
|---|---|
| *AdJust Open (d/b/a/ Energy Professional Group) v. EcoStim, Inc.* (269th District Court, Harris County, Texas, Case No. 1142516) | Breach of Contract |

**Solutions.**

| ***Litigation*** | ***Nature of Dispute*** |
|---|---|
| *Dragon Products v. Eco-Stim Energy Solutions, Inc.* (28th District Court, Jefferson County, Texas, Case No. A-9292258) | Breach of Contract |
| *Spectra Services, LLC v. Eco-Stim Energy Solutions, Inc.* (269th District Court, Harris County, Texas, Case No. 2018-72886) | Breach of Contract |
| *Simons Petroleum, LLC v. Eco-Stim Energy Solutions, Inc.* (96th District Court, Tarrant County, Texas, Case No. 096-30166-18) | Breach of Contract |
| *Van Zandt Supply v. Eco-Stim Energy Solutions, Inc.* (Kingfisher County District Court, Oklahoma, Case No. 2018-010663) | Crossclaim |

| | |
|---|---|
| *DFS Inspections v. Eco-Stim Energy Solutions, Inc.* (269th District Court, Harris County, Texas, Case No. 2019-00318) | Breach of Contract |
| *Eco-Stim Energy Solutions, Inc.* (Oklahoma Tax Commission) | Tax Audit |
| *Eco-Stim Energy Solutions, Inc.* (Texas Comptroller of Public Accounts, Case No. 3-20534-7596-1) | Tax Audit |

## ARTICLE VI
## MATTERS ARISING DURING THE CHAPTER 11 CASES

6.1     **Commencement of the Debtors' Cases.** The Debtors' Chapter 11 Cases were commenced by the filing of voluntary petitions under Chapter 11 on the Petition Date.  Shortly after these Cases were commenced, the Debtors filed several motions incident to the management of these Cases, including a: (i) motion for joint administration of the Debtors' Chapter 11 Cases; (ii) motion to retain KCQ as the Debtors' primary bankruptcy counsel; (iii) motion to pay and provide adequate assurance to the Debtor's utilities; (iv) motion to pay prepetition salaries, wages and benefits; (v) motions to make payments on and maintain current insurance programs; (vi) motion to continue workers' compensation and insurance; and (vii) motion to maintain the Debtors' current cash management system; (collectively, the "Initial Relief Motions").   As of the date of this Disclosure Statement, the motion for joint administration, motion for pay prepetition salaries/wages/benefits, motion to pay and maintain current insurance programs, and motion to maintain cash management systems have been approved by the Bankruptcy Court.  All other Interim Relief Motions remain pending.

6.2     **Events Occurring After Commencement of the Debtors' Cases.** On April 23, 2020, the Debtors filed: (i) the Plan; and (ii) this Disclosure Statement.  On April 23, 2020, the Debtors filed their *Emergency Motion for Order (1) Conditionally Approving Disclosure Statement; Fixing Record Date For Voting; (3) Approving Plan Solicitation Package And Voting Procedures; (4) Setting Deadlines To Vote On Plan And Object To Plan And Disclosure Statement; And (5) Setting Hearing On Final Approval Of Disclosure Statement And Plan Confirmation* [Docket No. 39] (the "**Conditional Approval Motion**"), pursuant to which the Debtors requested, among other things: (i) conditional approval of the Disclosure Statement in order to immediately solicit votes on the Plan; (ii) a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan; and (iii) approval of a solicitation package setting deadlines and procedural requirements in connection with the chapter 11 confirmation process.  As of the date of this Disclosure Statement, the Conditional Approval Motion is awaiting disposition by the Bankruptcy Court.

## ARTICLE VII
## THE PLAN OF REORGANIZATION

The Debtors believe that the Plan provides the best vehicle by which Holders of Allowed General Unsecured Claims can maximize the recovery on their Allowed Claims. The Debtors urge you to review carefully and then vote to accept the Plan.

### 7.1    Summary of the Plan

The Plan provides for the substantive consolidation of the Debtors and the vesting of all assets of the Debtors in a liquidating trust (the "**Liquidating Trust**") which will be charged with preservation and distribution to creditors of the proceeds of said assets, including: (i) all of the Debtors' available Cash on hand as of the Effective Date (the "**Initial Trust Funding**"); (ii) Net Cash Proceeds from any collections by Eco Argentina and/or the liquidation of the Eco Argentina Interests; (iii) Net Cash Proceeds from any liquidation of the Viking Holding Interests; (iv) Net Cash Proceeds from any liquidation of the Viking Holding Interests; (v) Net Cash Proceeds from any liquidation of the Viking Interests; (vi) all Causes of Action by the Debtors not explicitly released under the Plan; (vii) all other rights of the Debtors to payment set forth herein; and (viii) all products and proceeds from any of the foregoing (items i-viii herein, the "**Liquidating Trust Assets**"), all as provided in the terms and timeframes as follows:

1.    The Plan contemplates substantive consolidation of the Debtors' Estates.

2.    The Debtors will continue to operate as debtors in possession from the Petition Date through the Effective Date.

3.    On the Effective Date, the Liquidating Trust will be established, pursuant to the terms of a liquidation trust agreement (the "**Liquidation Trust Agreement**"). The Liquidation Trust shall have the authority to, among other things:  (i) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (ii) liquidate any non-Cash Liquidating Trust Assets other than the Eco Argentina Interests, the Viking Holding Interests, and the Viking Interests, with such interests instead to be liquidated by counsel for the non-Debtor subsidiaries for the benefit of the Liquidating Trust and whose proceeds shall be transferred into the Liquidating Trust upon liquidation; (iii) calculate and implement Distributions of Liquidating Trust Assets; (iv) investigate, prosecute, compromise, and settle Causes of Action vested in the Liquidating Trust; (v) resolve issues involving Claims and Equity Interests, including but not limited to objecting to Claims; and (vi) undertake all administrative functions of the Plan and the Debtors' chapter 11 cases.

4.    All Allowed Administrative Claims will be paid on or before the Effective Date, unless otherwise agreed as set forth in the Confirmation Order.

5.    All Allowed Priority Tax Claims will be treated in accordance with 1129(a)(9)(c) of the Bankruptcy Code.

6.    All Allowed Class 1 Secured Claims, to the extent any exist, will be paid in full and in Cash on the Effective Date.

7.    All Allowed Class 2 General Unsecured Claims will be accorded the following treatment: except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, until the earlier of: (i) each such holder being paid in full on account of its Allowed General Unsecured Claim, and (ii) the Trust Disbursement Termination Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive: (a) on the Effective Date, such holder's Pro Rata share (among holders of Allowed Class 2 Claims) of the Initial Distribution (defined below); (b) in the event of the occurrence of a Liquidating Event, such holder's Pro Rata share (among holders of Allowed Class 2 Claims) of Net Cash Proceeds from such Liquidating Event; and (c) such holder's Pro Rata share (among holders of Allowed Class 2 Claims) of Distributions from all other Liquidating Trust Assets; *provided, however*, that no Distributions to Allowed General Unsecured Claims shall be made prior to payment in full of all Allowed Secured Claims.

8.    All Class 3 Equity Interests in Solutions shall be deemed canceled upon the Effective Date.

9.    All Class 4 Equity Interests in Eco Inc. shall be deemed canceled upon the Effective Date.

**7.2**    **The Litigation Trust**

(a)    **Creation of the Litigation Trust and Appointment of the Litigation Trustee.**

1.    On the Effective Date, the Liquidation Trust will be created pursuant to the Liquidation Trust Agreement.

2.    The Liquidation Trust shall be administered by the Liquidation Trustee, an independent third-party identified in the Liquidation Trust Agreement whose identity and compensation shall be disclosed to and approved by the Bankruptcy Court at the Confirmation Hearing.  Notice of the establishment of the Liquidation Trust shall be filed and served via ECF.

(b)    **Property of the Litigation Trust.**

l.      On the Effective Date, the Liquidating Trust Assets shall, without the need for further action by the Debtors or the Bankruptcy Court, vest in the Liquidating Trust free and clear of all liens, Claims and interests, except as otherwise specifically provided in the Plan or in the Confirmation Order.

(c)      **Purpose of the Litigation Trust.**

l.      The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets other than the Eco Argentina Interests, the Viking Holding Interests, and the Viking Interests, with such interests instead to be liquidated by counsel for the non-Debtor subsidiaries for the benefit of the Liquidating Trust and whose proceeds shall be transferred into the Liquidating Trust upon liquidation; (ii) prosecuting and resolving all Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; (iv) objecting to Claims; and (v) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

(d)      **Beneficiaries of the Liquidating Trust.**

l.      The holders of Allowed Secured Claims (the extent any exist) and Allowed General Unsecured Claims entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

(e)      **Role, Powers, and Duties of the Liquidating Trustee.**

l.      The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (i) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (ii) pay taxes or other obligations incurred by the Liquidating Trust; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and

19

assist in the administration, prosecution and distribution of Liquidating Trust Assets; (iv) calculate and implement Distributions of Liquidating Trust Assets; (v) investigate, prosecute, compromise, and settle Causes of Action vested in the Liquidating Trust, in accordance with the specific terms of the Liquidating Trust Agreement,; (vi) resolve issues involving Claims and Equity Interests in accordance with this Plan, including but not limited to objecting to Claims; and (vii) undertake all administrative functions of the Plan and the Debtors' chapter 11 cases, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtors' chapter 11 cases.

2.    On the Effective Date, the Liquidating Trustee shall: (i) take possession of all books, records, and files of the Debtors and their Estates; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

3.    The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

4.    The Liquidating Trustee shall have the right to object to Claims not otherwise Allowed in connection with the post-Effective Date Claims allowance process.

5.    In no event later than 30 Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with this Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Liquidating Trustee under this Plan through each applicable reporting period.

6.    The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan. The Liquidating Trust also shall annually (for tax years in which Distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such

items on their federal income tax returns; *provided, however*, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

7. As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit for taxing purposes. The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

8. The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtors, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

(f) **Summary of Liquidating Trust Funding and Allocation of Liquidation Trust Assets.**

1. On the Effective Date, the Liquidating Trust will be initially funded via the Initial Trust Funding. The Initial Trust Funding will be allocated towards the following on the Effective Date: (i) first, the Liquidating Trustee shall use Available Cash as of the Effective Date to pay Allowed Administrative Claims and Allowed Priority Claims; (ii) second, the Liquidating Trustee shall make an initial distribution (the "**Initial Distribution**") from remaining Available Cash to Allowed Secured Claims and Allowed Unsecured Claims, in accordance with the distribution scheme detailed in the Plan; and (iii) third, subsequent to the Initial Distribution, the Liquidating Trustee shall make further periodic Distributions to Allowed Secured Claims and Allowed General Unsecured Claims upon the occurrence of a Liquidating Event and until the occurrence of the Trust Disbursement Termination Date.

(g)    **Prosecution and Resolution of Causes of Action.**

    1.    From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to this Plan and the Confirmation Order.  From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Debtors' Estates pursuant to Bankruptcy Code section 1123(b)(3).  Proceeds recovered from all such Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under this Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan.  The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under this Plan.

    2.    Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than $100,000.00; and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals or exceeds $100,000.00.

(h)    **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets.**

    1.    For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

(i)    **Liquidating Trust Expenses.**

    1.    Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee

in administering the applicable provisions of this Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

(j)     **Termination of the Litigation Trust.**

1.     The Liquidating Trust shall terminate upon the earlier of: (i) the date on which all of the Liquidating Trust Assets are liquidated in accordance with the Plan, the funds in the Liquidating Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities, and the order closing the Chapter 11 Cases is a Final Order; or (ii) five (5) years from the date of creation of the Liquidating Trust, unless extended by the Bankruptcy Court as provided in the Plan.

**7.3     Acceptance and Confirmation of the Plan**

(a)     **Requirements for Confirmation.** At the confirmation hearing, the Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 of the Bankruptcy Code, as applicable here, provides as follows:

(i)     The Plan must comply with the applicable provisions of the Bankruptcy Code, including section 1123 which specifies the mandatory contents of a plan and section 1122 which requires that Claims and Interests be placed in Classes with "substantially similar" Claims and Interests (section 1129(a)(1)).

(ii)     The Debtors proposing the Plan must comply with the applicable provisions of the Bankruptcy Code (section 1129(a)(2)).

(iii)     The Plan must have been proposed in good faith and not by any means forbidden by law (section 1129(a)(3)).

(iv)     Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case, must be disclosed to the Court and approved or be subject to the approval of the Court as reasonable (section 1129(a)(4)).

(v)    The Debtors must disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as the Liquidating Trustee. The appointment of the Liquidating Trustee must be consistent with the interests of the Debtors' creditors and equity holders, and with public policy.

(vi)    The Plan must meet the "best interest of creditors" test which requires that each holder of a Claim or Interest of a Class of Claims or Interests that is impaired under the Plan either accept the Plan or receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. If the holders of a Class of Secured Claims (to the extent such holders exist) make an election under section 1111(b) of the Bankruptcy Code, each holder of a Claim in such electing Class must receive or retain under the Plan on account of its Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of its interest in the Debtor's interest in the property that secures its Claim (section 1129(a)(7)). To calculate what non-accepting holders would receive if the Debtors were liquidated under Chapter 7, the Court must determine the dollar amount that would be generated upon disposition of the Debtors' assets and reduce such amount by the costs of liquidation. Such costs would include the fees of a Trustee (as well as those of counsel and other professionals) and all expenses of sale.

(vii)    Each Class of Claims or Interests must either accept the Plan or not be impaired under the Plan (section 1129(a)(8)).

(viii)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that holders of Administrative Claims and Priority Claims (other than tax claims) will be paid in full in cash on the Effective Date of the Plan, and that holders of Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such tax, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim (section 1129(a)(9)).

(ix)    At least one impaired Class must accept the Plan, determined without including the acceptance of the Plan by any insider holding a Claim of such Class (section 1129(a)(10)).

(x)    The Plan must be "feasible." In other words, it cannot be likely that Confirmation will be followed by the liquidation, or the need for

further financial reorganization, of the Debtors or any successor to the Debtor s under the Plan, unless (as here) such liquidation is proposed in the Plan (section 1129(a)(11)).

(xi)     All fees required to be paid under the Bankruptcy Code have been paid or the Plan provides for such payment on its Effective Date (section 1129(a)(12)).

(b)     **The Plan Meets All of the Requirements for Confirmation.**  The Debtors believe that the Plan satisfies all statutory requirements of Chapter 11 of the Bankruptcy Code and should be confirmed.  More specifically:

(i)      The Plan complies with all of the applicable provisions of the Bankruptcy Code;

(ii)     The Debtors have complied with the Bankruptcy Code and has proposed the Plan in good faith;

(iii)    All disclosure requirements concerning payments made or to be made for services rendered in connection with the Chapter 11 case or the Plan have been or will be met prior to or at the Confirmation Hearing; and

(iv)     Administrative Claims, Priority Claims, and fees required to be paid under the Code are appropriately treated under the Plan.

## ARTICLE VIII
## LIQUIDATION ANALYSIS

A liquidation analysis of the Debtors' business is attached hereto as **Exhibit B**.  The Debtors have considered alternatives to the Plan, such as a liquidation of the Debtors' holdings in a Chapter 7 case, and do not believe that a Chapter 7 liquidation would afford the holders of Claims or Interests a return as great as may be achieved by the Chapter 11 liquidating process proposed by the Plan.  Specifically:

- A Chapter 7 liquidation would result in an outright winddown of Eco Argentina and/or a "fire-sale" of the Eco Argentina Interests.  Either of these occurrences would result in a far inferior realization to the Debtors' creditors relative to the Chapter 11 liquidation proposed by the Plan, which will afford time: (i) for a proper sale process of the Eco Argentina Interests, the Debtors' primary non-Cash asset, that will maximize Cash for Distribution to creditors via the Liquidating Trust; and/or (ii) allow time for Eco Argentina to liquidate its remaining receivables and inject the resultant proceeds into the Debtors' Estates.[4]  The

---

[4] The Chapter 11 process promulgated by the Plan contemplates the continued retention by Eco Argentina of Fernandez during the pendency of these Chapter 11 Cases.  Fernandez is the only individual employed by Eco Argentina with the requisite internal knowledge to keep Eco Argentina afloat during these bankruptcies and effect a

Debtors strongly believe that the increased value of its asset base via the Plan will far outweigh any costs or expenses borne by the Estates during the pendency of these Chapter 11 Cases, particularly in light of the fact that the Debtors are merely "keeping the lights on" during the pendency of the liquidation of Eco Argentina and/or the sale of the Eco Argentina Interests, and do not anticipate any events which would cause a diminution of their asset base while in Chapter 11.

- Under Chapter 7, a trustee would be appointed to administer the Estates, resolve any pending controversies against the Debtors and claims of the Estate against other parties, and to make Distributions to creditors.  If the Cases were converted to cases under Chapter 7, significant additional Administrative Expenses would be incurred.  Any distributions to holders of Claims would be substantially delayed and, in all likelihood, reduced as compared to the anticipated results of Confirmation of the Plan.  A Chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code.  A Chapter 7 trustee might also seek to retain new professionals, including attorneys and accountants, in order to resolve any disputed Claims and possibly to pursue claims of the Estates against other parties.

As the Plan affords creditors the potential for the greatest realization from the Debtors' assets, it is therefore in the best interests of Creditors.

**THE DEBTORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION TO THE HOLDERS OF SECURED AND UNSECURED CLAIMS, WHO WOULD LIKELY RECEIVE  LESS  IN A CHAPTER 7 LIQUIDATION. IN ADDITION, OTHER ALTERNATIVES WOULD INVOLVE DELAY, UNCERTAINTY, AND SUBSTANTIAL ADMINISTRATIVE COSTS.**

**ARTICLE IX**
**VOTING PROCEDURES**

**ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED, PURSUANT TO THE BANKRUPTCY CODE, BASED UPON THE ALLOWED CLAIMS AND ALLOWED INTERESTS THAT ACTUALLY VOTE ON THE PLAN.  THEREFORE, IT IS IMPORTANT THAT CLAIMANTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**9.1**     **Classes Entitled to Vote on the Plan**

All members of Impaired Classes who hold Allowed Claims are entitled to vote to accept or reject the Plan.  Section 1124 of the Bankruptcy Code generally provides that a class of claims or

---

proper liquidation of Eco Argentina's assets or, in the alternative, a sale of the Eco Argentina Interests.  No such retention would occur in a Chapter 7 context and would result in a greatly diminished realization from the liquidation of Eco Argentina's assets and/or a sale of the Eco Argentina Interests.

interests is considered to be Impaired under a plan unless the plan does not alter the legal, equitable and contractual rights of the holders of such claims or interest.   For purposes of Plan solicitation, only Class 2 General Unsecured Claims are Impaired and thus entitled to cast ballots on this Plan.

**9.2**     **Persons Entitled to Vote on the Plan**

Only holders of Allowed Claims and holders of Disputed Claims which have been temporarily allowed for voting purposes are entitled to vote on the Plan.  For purposes of the Plan, an Allowed Claim is: (i) a Claim against the Debtors, proof of which, if filed on or before the Bar Date, is not a Contested Claim; (ii) if no proof of Claim was so filed, a Claim against the Debtors that has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent; or (iii) a Claim or Interest allowed hereunder or by Final Order.   An Allowed Claim does not include any Claim or portion thereof which is a Disallowed Claim which has been subsequently withdrawn, disallowed, released or waived by the holder thereof, by this Plan, or pursuant to a Final Order.  Unless otherwise specifically provided in the Plan, an Allowed Claim shall not include any amount for punitive damages or penalties.  Therefore, although the holders of Disputed Claims will receive ballots, these votes will not be counted unless such Claims become Allowed Claims as provided under the Plan or are temporarily allowed for voting purposes by the Court.

**ONLY THE CLAIMS IN CLASS 2 UNDER THE PLAN ARE IMPAIRED AND ARE ENTITLED TO VOTE WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN.**

**9.3**     **Votes Required For Class Acceptance**

As a condition to Confirmation, the Bankruptcy Code requires that each impaired Class of Claims or Interests accept the Plan.  During the Confirmation Hearing, the Bankruptcy Court will determine whether the Classes voting on the Plan have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Allowed Claims actually voting in such Classes.  A Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan: (i) hold at least two-thirds of the total amount of the Allowed Claims of the holders in such Class who actually vote; and (ii) constitute more than one-half in number of holders of the Allowed Claims in such Class who actually vote on the Plan.

**9.4**     **Voting Instructions**

(a)     **Ballots and Voting.**  Holders of Allowed Claims entitled to vote on the Plan have been sent a Ballot, together with instructions for voting, with this Disclosure Statement.  Claimants should read the Ballot carefully and follow the instructions contained therein. In voting for or against the Plan, please use only the Ballot that accompanies this Disclosure Statement.

**EACH CREDITOR WILL RECEIVE A SINGLE BALLOT ONLY. IF YOU HAVE MORE THAN ONE CLAIM AGAINST THE DEBTORS, YOU MAY REPRODUCE THIS BALLOT AS MANY TIMES AS NECESSARY TO PROPERLY VOTE YOUR CLAIMS. IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR VOTING PROCEDURES, YOU SHOULD CONTACT COUNSEL FOR THE DEBTORS:**

**KILMER CROSBY & QUADROS PLLC**
**c/o BRIAN KILMER**
**712 Main Street, Suite 1100**
**Houston, Texas 77002**
**Telephone:  713-300-9662**
**Facsimile:  214-731-3117**

**BALLOTS THAT ARE SIGNED AND RETURNED, BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN, SHALL BE COUNTED AS BALLOTS FOR THE ACCEPTANCE OF THE PLAN IF PERMITTED BY THE BANKRUPTCY COURT.**

(a)  **Returning Ballots and Voting Deadline.** You should complete and sign each Ballot that you receive and return it in the pre-addressed envelope enclosed with each Ballot to the counsel for the Debtors in the self-addressed envelope provided, by the Voting Deadline.

**THE VOTING DEADLINE IS 5:00 P.M. (CST), ON  [_____]. IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY COUNSEL FOR THE DEBTORS ON OR BEFORE 5:00 P.M. (CST) ON THE VOTING DEADLINE AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

(b)  **Incomplete or Irregular Ballots.** Ballots which fail to designate the Class to which they apply shall be counted in the appropriate Class as determined by the Debtors, subject only to contrary determinations by the Bankruptcy Court.

(c)  **Changing Votes.** Bankruptcy Rule 3018(a) permits a Claimant, for cause, to move the Bankruptcy Court to permit such claimant to change or withdraw its acceptance or rejection of a plan of reorganization.

### 9.5 **Contested and Unliquidated Claims**

Contested Claims are not entitled to vote to accept or reject the Plan.   If you are the holder of a Contested Claim, you may ask the Bankruptcy Court pursuant to Bankruptcy Rule 3018 to have your Claim temporarily Allowed for the purpose of voting.

### 9.6 **Possible Reclassification of Creditors and Interest Holders**

The Debtors are required pursuant to section 1122 of the Bankruptcy Code to place Claims and Interests into Classes that contain substantially similar Claims or Interests.  While the Debtors believe that they have classified all Claims and Interests in compliance with section 1122, it is possible that a Claimant or Interest holder may challenge the classification of its Claim or Interest. If the Debtors are required to reclassify any Claims or Interests of any Claimants or Interest holders under the Plan, the Debtors, to the extent permitted by the Bankruptcy Court, intend to continue to use the acceptances received from such Claimants or Interest holders pursuant to the solicitation of acceptances using this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such Claimants or Interest holders are ultimately deemed to be a member.  Any reclassification of Claimants or Interest holders should affect the Class in which such Claimants or Interest holders were initially a member, or any other Class under the Plan, by changing the composition of such Class and the required vote thereof for approval of the Plan.

### ARTICLE X
### MODIFICATION OF THE PLAN

### 10.1 **Modification or Revocation of the Plan; Severability**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and any applicable notice requirements, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation.  The Debtors also reserve the right to withdraw the Plan prior to the Confirmation Date. If the Debtors withdraw the Plan, or if Confirmation does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan will: (i) constitute a waiver or release of any Claims or rights against, or any Interest in, the Debtors; or (ii) prejudice in any manner the rights of the Debtors.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, has the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

# ARTICLE XI
# RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement made by each Claimant as a whole in consultation with such Claimant's own advisors.

### 11.1    Uncertain Results From Collection of Eco Argentina Receivables.

The Plan contemplates that all receivables collected by Eco Argentina during the post-Effective Date period will be transferred to the Liquidating Trust for distribution to creditors. While the Debtors are optimistic that a significant portion of Eco Argentina's receivables may be collected, there is significant and inherent uncertainty as to the amount of the recovery, particularly in light of current sector conditions and their impact on the ability of Eco Argentina's counterparties to make full payment on the receivables. This factor should accordingly be considered in any decision to accept or reject the Plan.

### 11.2    Uncertain Results From Sale of Eco Argentina Interests.

The Debtors are hopeful that a sale of the Eco Argentina Interests will result in the realization of significant proceeds by the Estates for distribution to creditors. However, no sale has been consummated as of the date of this Disclosure Statement, and the Debtors do not have a current expectation as to the eventual Net Proceeds which will be generated by the sale. As such Net Proceeds will significantly impact Distributions, this uncertainty should be considered in a determination of whether to accept or reject the Plan.

### 11.3    Uncertainty of Litigation Settlements.

As detailed above, the Debtors have numerous pieces of pending litigation before multiple courts. While the Debtors are confident that they will be able to reach settlements with their various litigation counterparties, there is inherent uncertainty as to eventual agreed amounts of each settlement. As any settlement with a litigation counterparty will constitute a Class 2 General Unsecured Claim, such settlement claims will impact the overall distribution across the entirety of the General Unsecured Claims, and should be taken into account when considering whether to accept or reject the Plan.

### 11.4    Insufficient Acceptances

The Plan may not be confirmed without sufficient accepting votes. Each impaired Class of Claims and Interests receiving a distribution under the Plan is given the opportunity to vote to accept or reject the Plan. The Plan will be accepted by a Class of impaired Claims if the Plan is accepted by Claimants in such Class actually voting on the Plan who hold *at least* two-thirds (2/3) in amount and *more than* one-half (½) in number of the total Allowed Claims of that Class which actually vote. Class 1 Secured Claims are Unimpaired and are deemed to accept the Plan and are therefore not entitled to vote on the Plan. Class 3 Interests in Solutions and Class 4 Interests in Eco Inc. are

deemed to have rejected the Plan and are therefore not entitled to vote on the Plan. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

## ARTICLE XII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain possible federal income tax consequences of the Plan to the Debtors, and to the holders of Claims and Interests. It is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations, and administrative and judicial interpretations thereof which are now in effect, but which could change, even retroactively, at any time. This discussion does not address all aspects of federal, state and local tax laws that could impact the various classes of Claimants, the holders of Interests or the Debtor.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE DEBTOR WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

**12.1    Tax Consequences to the Debtors**. Under the IRC, a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the taxable year.  Section 108(a)(1)(A) of the IRC provides an exception to this general rule, however, in the case of a taxpayer that is under the jurisdiction of a bankruptcy court in a case brought under the Bankruptcy Code where the discharge of indebtedness is granted by the court or is pursuant to a Plan approved by the court, provided that the amount of discharged indebtedness that would otherwise be required to be included in income is applied to reduce certain tax attributes of the taxpayer. Section 108(e)(2) of the IRC provides that a taxpayer shall not realize income from the discharge of indebtedness to the extent that satisfaction of the liability would have given rise to a deduction.  As a result of sections 108(a)(1)(A) and 108(e)(2) of the IRC, the Debtors do not anticipate that any of them will recognize any taxable income from the discharge of indebtedness through the Chapter 11 Case.   Reductions in tax attributes (net operating loss carryover) will occur to the extent of cancellation of indebtedness income not recognized due to the above.

Under section 1141 of the Bankruptcy Code, confirmation of the Plan will discharge the Debtors from all debts except as provided for in the Plan. Implementation of the Plan may result in discharge of indebtedness to the Debtor as a matter of tax law to the extent of any unsatisfied portion of such Claims. Any such discharge of indebtedness should not be included in gross income of the Debtor, however, because of the exceptions to such inclusion discussed above.

**12.2    Tax Consequences to Creditors**. A creditor who receives cash or other consideration in satisfaction of any Claim may recognize ordinary income. The impact of such ordinary income, as well as the tax year for which the income shall be recognized, shall depend upon the individual circumstances of each Claimant, including the nature and manner of organization of the Claimant, the applicable tax bracket for the Claimant, and the taxable year of the Claimant. Each Creditor is urged to consult with its tax advisor regarding the tax implications of any payments or distributions under the Plan.

In general, the principal federal income tax consequences of the Plan to holders of Claims will be (a) recognition of loss or a bad debt deduction to the extent that the total payments received under the Plan with respect to the Claim are less than the adjusted basis of the holder in such Claim, or (b) recognition of taxable income by the holder of the Claim to the extent of the excess of the amount of any payments made under the Plan in respect of the Claim over the holder's adjusted basis therein.

Common examples of holders of Claims who may recognize taxable income upon receipt of payments under the Plan include (a) former employees with Claims for services rendered while serving as employees of the Debtor, (b) trade creditors whose Claims represent an item not previously reported in income (including Claims for lost income upon rejection of leases or other contracts with the Debtor), (c) holders of Claims who had previously claimed a bad debt deduction with respect to their Claims in excess of their ultimate economic loss, and (d) holders of Claims that include amounts of pre-petition interest that had not previously been reported in income. Common examples of Claims who may recognize a loss or deduction for tax purposes as a result of implementation of the Plan, provided that such holders are not paid in full, include holders of Claims that arose out of cash actually loaned or advanced to the Debtors, and holders of Claims consisting of items that were previously included in income of such holders on the accrual method of accounting, to the extent, in both cases, that the economic loss to such holders has not been allowed as a tax deduction in a prior year.

The amount and character or any resulting income or loss recognized for federal income tax consequences to a holder of any Claim as a result of implementation of the Plan will, however, depend on many factors. The most significant of these factors include: (i) the nature and origin of the Claim; (ii) whether the holder is a corporation; (iii) the extent to which the Plan provides for payment of the particular Claim; (iv) the extent to which any payment made is allocable to pre-petition interest which is part of such Claim; and (v) the prior tax reporting positions taken by the holder with respect to the item that constitutes the Claim. As to the last factor, relevant tax reporting positions include whether the holder had to report under its method of accounting any portion of the Claim (including accrued and unpaid interest) as income prior to receipt and whether the holder previously claimed a bad debt or worthlessness deduction with respect to the Claim, which would affect the adjusted basis of the holder in the Claim.

32

General rules for the deduction of bad debts are provided in IRC section 166 as follows:

If either: (i) the creditor is a corporation; or (ii) the debt is a business bad debt in the hands of the creditor, and the creditor demonstrates that the debt is collectable only in part, a deduction for partial worthlessness of the debt will be allowed to the extent that the debt is charged off in the accounting records of the creditor.

For a creditor not described in the previous paragraph, a bad debt deduction is allowable only in the year that the debt becomes wholly worthless.

If the creditor is not a corporation and the debt is a nonbusiness bad debt, the bad debt deduction is treated as a short-term capital loss, which can offset only capital gain income and a limited amount of ordinary income.

For purposes of IRC section 166, a "nonbusiness debt" means a debt other than (i) a debt created or acquired in connection with the creditor's trade or business, or (ii) a debt the loss from the worthlessness of which was incurred during the operation of the creditor's trade or business.

The time as of which a debt becomes worthless (or partially worthless), and therefore the tax year in which a creditor may claim a bad debt deduction, is a question of fact. Pursuant to Income Tax Regulations ("Regs.") section 1.166-2(c), as a general rule, bankruptcy is an indication of the worthlessness of at least a part of an unsecured, non-priority debt.  In bankruptcy cases, a debt may become worthless before settlement in some instances, and only when a settlement in bankruptcy has been reached in other instances. The mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless (or partially worthless), does not necessarily shift the deduction to such later year. Thus, even though the precise amount that holders of General Unsecured Claims or other Claims will receive under the Plan may not be known until the final distribution date, the determination of the precise amount that will be paid under the Plan with respect to a Claim, or that no amount will be paid, does not necessarily establish that any resulting bad debt deduction is properly allowable in the Creditor's tax year in which the final distribution is made, rather than in an earlier year.  Accordingly, to the extent that a Creditor may claim a bad debt deduction which it has not previously claimed, it is possible that the Creditor will be required to amend its return for a prior year and claim the deduction in that year, rather than in the year in which the final distribution is made. Creditors should consult with their individual tax advisors with respect to this issue.

The extent to which a gain or a loss may be recognized by a holder of a Claim upon implementation of the Plan may be significantly affected by any bad debt deduction that may have been claimed by the holder in a prior year with respect to the debt on which the Claim is based. If the holder took a bad debt deduction in a prior year which is recovered in whole or part through a payment made to the holder pursuant to the Plan, the holder will generally be required to include in income the amount recovered in the year the holder receives the payment.  An exception to this rule permits exclusion of a recovery of a prior bad debt deduction to the extent that the earlier bad debt deduction did not produce a tax benefit to the holder.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

### ARTICLE XIII
### RECOMMENDATION OF THE DEBTORS

The Debtors believe that the Plan is in the best interests of all creditors. Accordingly, the Debtors recommend that you vote for acceptance of the Plan and hereby solicit your acceptance of the Plan.

**DATED**: April 23, 2010

**DEBTORS:**

**ECO-STIM ENERGY SOLUTIONS, INC.**

By: */s/ Alexander Nickolatos*
        Alexander Nickolatos, CEO

**ECOSTIM, INC.**

By: */s/ Alexander Nickolatos*
        Alexander Nickolatos, CEO

**KILMER CROSBY & QUADROS PLLC**

By:  */s/ Brian A. Kilmer*
Brian A. Kilmer
Texas Bar No.: 24012963
Email: bkilmer@kcq-lawfirm.com
Meritt Crosby
Texas Bar No. 24050462
Email: mcrosby@kcq-lawfirm.com
Stephen Risley

Texas Bar No.: 24099933
Email: srisley@kcq-lawfirm.com
712 Main Street, Ste. 1100
Houston, Texas 77002
Telephone: 713-300-9662
Fax: 214-731-3117

**PROPOSED COUNSEL FOR DEBTORS**